IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————————————————

APPEAL NO. 23-11607

———————————————————————

STEFAN EBERHARD ZAPPEY,

Appellant,

v.

UNITED STATES OF AMERICA,

Appellee.

———————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

———————————————————————

BRIEF OF APPELLANT

———————————————————————

THIS IS A DIRECT APPEAL FROM A FINAL JUDGMENT IN A CRIMINAL
CASE PURSUANT TO 28 U.S.C. §1291

———————————————————————

DONALD F. SAMUEL, ESQ.
GARLAND, SAMUEL & LOEB, P.C.
3151 MAPLE DRIVE, N.E.
ATLANTA, GEORGIA 30305

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,      )
          )
      Plaintiff -Appellee,      )
          )
      v.      )      Appeal No.: 23-11607
          )
STEFAN EBERHARD ZAPPEY,      )
          )
      Defendant-Appellant.      )

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Local Rule 28-2(b), counsel for appellant, James Heaton, certifies that the following persons may have an interest in the outcome of this case:

1.    Timothy C. Batten, United States District Judge

2.    Leanne Michelle Marek, Attorney for Plaintiff

3.    Amanda R. Clark Palmer, Attorney for Defendant

4.    Eduardo A Palomo, Attorney for Plaintiff

5.    Donald Franklin Samuel, Attorney for Defendant

6.    Kendal Demetrius Silas, Attorney for Defendant

7.    Russell G. Vineyard, United States Magistrate Judge

8.    Stefan E. Zappey, Defendant/Appellant

9.    Lawrence J. Zimmerman, Attorney for Defendant

This 25th day of August, 2023.

i

RESPECTFULLY SUBMITTED,

**GARLAND, SAMUEL & LOEB, P.C.**

/s/ *Donald F. Samuel*
DONALD F. SAMUEL
Georgia Bar No. 624475
Attorney for Appellant

3151 Maple Drive, N.E.
Atlanta, GA  30305
Phone: 404-262-2225
Email: dfs@gsllaw.com

ii

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for Appellant respectfully requests oral argument in this case to enable further elaboration on the issues presented by this appeal.

## **TABLE OF CONTENTS**

|  | **Pages** |
|---|---|
| Certificate of Interested Persons | i |
| Statement Regarding Oral Argument | iii |
| Table of Contents | iv |
| Table of Authorities | v |
| Jurisdictional Statement | ix |
| Statement of Issues for Review | ix |
| Statement of the Case | 1 |
| Statement of the Facts | 3 |
| Summary of the Argument | 7 |
| Argument | 10 |
| Conclusion | 44 |
| Certificate of Compliance | 47 |
| Certificate of Service | 48 |

## <u>TABLE OF AUTHORITIES</u>

| Cases | Pages |
|---|---|
| *Anders v. Hometown Mortg. Servs.,* 346 F.3d 1024, 1031 (11th Cir. 2003) | 13 |
| *Bachman v. Leapley*, 953 F.2d 440, 442 (1992) | 19 |
| *Clark v. Edison*, 881 F. Supp.2d 192, 210–212 (D. Mass. 2012) | 39 |
| *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) | 11 |
| *Hurley v. Superintendent Mercer SCI*, 757 Fed.Appx 114, 116, 118 (3d Cir. 2018) | 21 |
| *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) | 11 |
| *State v. Henderson*, 208 N.J. 208, 241–242 (2011) | 18 |
| *Thill v. Richardson*, 996 F.3d 469, 473–74 (7th Cir. 2021) | 20 |
| *United States v. Aguillard,* 217 F.3d 1319, 1321 (11th Cir. 2000) | 13 |
| *United States v. Antone*, 981 F.2d 1059, 1062 (9th Cir. 1992) | 21 |
| *United States v. Azure,* 801 F.2d 336, 340 (8th Cir. 1986) | 20 |
| *United States v. Bartlett*, 567 F.3d 901, 906–07 (7th Cir. 2009) | 16, 21 |
| *United States v. Brownlee*, 454 F.3d 131, 140–44 (3d Cir. 2006) | 16, 22 |

| | |
|---|---|
| *United States v. Countentos*, 651 F.3d 809, 820–21 (8th Cir. 2011) | 19 |
| *United States v. Davis*, 690 F.3d 226, 257 (4th Cir. 2012) | 16, 21 |
| *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985) | 16, 22 |
| *United States v. Edwards*, 819 F.2d 262, 264 (11th Cir. 1987) | 39 |
| *United States v. Fred Smith*, 122 F.3d 1355 (11th Cir. 1997) | 10, 12 |
| *United States v. Granbois*, 119 Fed.Appx. 35, 38 (9th Cir. 2004) | 21 |
| *United States v. Harris*, 995 F.2d 532, 535 (4th Cir. 1993) | 21 |
| *United States v. Hill*, 749 F.3d 1250, 1262–63 (10th Cir. 2014) | 20 |
| *United States v. Mathis*, 264 F.3d 321, 339–40 (3d Cir. 2001) | 22 |
| *United States v. Moore,* 786 F.2d 1308, 1313 (5th Cir. 1986) | 15, 16, 21 |
| *United States v. Nolan*, 956 F.3d 71, 79–83 (2d Cir. 2020) | 15, 20 |
| *United States v. Owens*, 682 F.3d 1358 (11th Cir. 2012) | 12, 14 |
| *United States v. Rouse*, 111 F.3d 561, 571 (8th Cir. 1997) | 19 |
| *United States v. Smith*, 148 Fed.Appx. 867, 872 (11th Cir. 2005) | 11, 12 |

| | |
|---|---|
| *United States v. Smith*, 156 F.3d 1046, 1053–54 (10th Cir. 1998) | 17, 21 |
| *United States v. Smith*, 370 Fed.Appx. 29 (11th Cir. 2010) | 13 |
| *United States v. Smith*, 621 F.Supp.2d 1207, 1214 n. 3 (M.D. Ala. 2009) | 13 |
| *United States v. Smith,* 736 F.2d 1103, 1107 (6th Cir. 1984) | 17 |
| *United States v. Smithers*, 212 F.3d 306, 311–18 (6th Cir. 2000) | 15, 22 |
| *United States v. Stevens*, 935 F.2d 1380 (3d Cir. 1991) | 22 |
| *United States v. Thevis*, 665 F.2d 616, 641 (5th Cir. Unit B 1982) | 12 |
| *United States v. Villiard*, 186 F.3d 893, 895 (8th Cir. 1999) | 16, 19 |
| *United States v. Whitted*, 11 F.3d 782, 785–87 (8th Cir. 1993) | 19 |
| *Watts v. BellSouth Telcomms., Inc.,* 316 F.3d 1203, 1207 (11th Cir. 2003) | 13 |
| *Young v. Conway*, 698 F.3d 69, 77–89 (2d Cir. 2012) | 32 |

| **Statutes** | **Pages** |
|---|---|
| 18 U.S.C. §§ 2241(c) | 1 |

| | |
|---|---|
| 18 U.S.C. §§ 3261 | 1 |
| 28 U.S.C. § 1291 | ix |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction of this appeal, as it is a direct appeal of a final judgment in a criminal case, pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES FOR REVIEW

1. Did the trial court abuse its discretion in excluding the expert testimony of the defense regarding memory, in a case where the testimony of witnesses' memories of events allegedly formed 14 years prior, during childhood, constitute the only evidence of criminal wrongdoing?

2. Did the trial court abuse its discretion in excluding the expert testimony of the defense regarding memory to counter the government's expert testimony on late reporting of sexual abuse, trauma, and memory which the court permitted the government to present?

## STATEMENT OF THE CASE

Stefan Eberhard Zappey was arrested on July 23, 2021, and indicted by second superseding indictment in the North District of Georgia on October 4, 2022, alleging four counts of Aggravated Sexual Abuse of a Child Committed by a Person Employed by the Armed Forces Outside the United States, under 18 U.S.C. §§ 3261 and 2241(c), and four counts of Abusive Sexual Contact Committed by a Person Employed by the Armed Forces Outside the United States, under 18 U.S.C. §§3261 and 2244(a)(5).

Anticipating trial, Mr. Zappey provided notice on November 22, 2022, of intent to provide expert testimony related to the history, science, and best practices for forensic interviewing, corroboration and contagion in multiple alleged victim cases, the effects of child abuse on victims, disclosure and delayed disclosure, memory and taint factors, suggestibility, and grooming. Government's Omnibus Motion in Limine, Dec. 19, 2022, Doc. 68, p. 4.

The government filed a motion in limine seeking to exclude defense experts on various aspects of memory, arguing primarily that their testimony was not

scientific and would improperly comment on the credibility of the government's witnesses. *Id.*

At a pretrial conference on January 9, 2023, the trial court ruled it would allow the experts to testify with the provision that they not comment directly on the specific interviews of the alleged victims themselves.

Mr. Zappey's trial began on January 10, 2023. At trial, after the government's expert had already testified fully, the government renewed its objection to the defense experts' testimony, leading to a lengthy sidebar and hearing outside the presence of the jury. The court expressed concern that the issue of the experts was now a "sideshow" and sustained the government's objections, limiting one expert to basic questions of memory, and totally excluding the second expert. Transcript, Vol. 4, p. 42–43; Vol. 5, pp. 4–22.

After five days of testimony, the jury returned a verdict of guilty on all counts. T. Vol. 5, p. 119.

On May 2, 2023, the district court sentenced Mr. Zappey to life in prison. Transcript of Sentencing Hearing, Doc. 96, 97. Mr. Zappey is currently incarcerated.

On May 5, 2023, Mr. Zappey timely filed a notice of appeal. Notice of Appeal, Doc. 98. Mr. Zappey is currently serving that life sentence.

2

## STATEMENT OF FACTS

Stefan Zappey was a beloved teacher at Patch Elementary School, located on a U.S. military base near Stuttgart, Germany, serving primarily children of military members or contractors. T. Vol. 1, pp. 31, 33. Mr. Zappey won the Department of Defense Education Activity Teacher of the Year award among all the federal school system's schools in Europe. T. Vol. 1, pp. 63, 93; Vol. 2, pp. 203, 219–221. Mr. Zappey's multi-level German immersion class included first through third graders and was widely acclaimed, parents saw that their children excelled in his classes and sought to get their children onto a waitlist for Mr. Zappey's class. T. Vol. 1, pp. 36–37, 56; Vol. 2, pp. 220; Vol. 4, 165. Likewise, children loved Mr. Zappey and loved being in his class. T. Vol. 2, pp. 114, 153; Vol. 4, p. 166, 185, 200.

Teachers and students described the tight-knit military community at Patch as a family. T. Vol. 1, p. 33; Vol. 4, p. 140. Mr. Zappey was known as a teacher who would show affection to his students. T. Vol. 2, p. 101. Children would often initiate affection through hugs, running to "attack" Mr. Zappey with hugs, holding hands, patting heads, and touching. Vol. 2, p. 141, 153; Vol. 4, pp. 107, 126, 138–139, 175, 178–79. Mr. Zappey engaged in such touching universally with all students. T. Vol. 1, pp. 45, 74; Vol. 2, p. 102. On one occasion, an art teacher at the school noticed a

3

child run and jump into Mr. Zappey's arms, straddling him with her legs; and Mr. Zappey took one step and put her down. T. Vol. 2, p. 141. The same teacher reported this to the assistant principal, and also reported that Mr. Zappey had touched students' hair and that a student had put her feet on top of his while he walked, all of which she felt was not appropriate. *Id.*, pp. 141–42.

In 2020, student Anna Dececco, was contacted on Facebook by a woman alleging Mr. Zappey was a child molester and that the army ("CID") had opened an investigation into him based on her niece's (Maeve Hennesy's) report. T. Vol. 1, pp. 57–58, 63. The woman also contacted Anna's mother, who is a military lawyer, and soon afterward Anna was contacted by CID and eventually interviewed by CID, the FBI, and U.S. prosecutors. *Id.*, pp. 60–62. Anna told them that in 2007, 13 years prior, Mr. Zappey had touched her genitals under her pants on three separate occasions.

Miss Dececco testified that she had never forgotten these events, but that the memories were always there with her. *Id.*, pp. 58, 99. She also, however, told previous interviewers that she had "forgotten" the event entirely and that her memory had been "unlocked." *Id.*, pp. 69–70. She further confessed that her mother

directed her to present herself at trial as confident in her memories so she could "avenge" the "little girl." *Id*., p. 68.

Student Maeve Hennesy testified that Mr. Zappey touched her genitals under her pants multiple times over the course of three years, 2008 through 2010, in the presence of other students. T. Vol. 3, pp. 105–107. She stated she reported this to her mom after watching a video on inappropriate touching in a Roman Catholic Church class four years later, but asked her mom not to tell anyone else or call the police. *Id*., p. 112. She and her mother also did not tell her father, who is a Marine JAG lawyer. *Id.*, pp. 88, 117–18. She did not decide to make her report public until contacted by CID in 2020 (10 years after she was a student in Mr. Zappey's class), and she provided forensic interviews. *Id*., p. 120. Miss Hennesy also testified that she had never forgotten her experiences, despite telling prior forensic interviewers that her memory "clicked" at a later time, and at another point that such memories were upsetting and "could not be retrieved by the conscious mind." *Id*., pp. 140–141.

Student Caroline Hall stated that she first reported Mr. Zappey touched her butt and between her buttocks under her underwear after being contacted by CID and interviewed in 2020. T. Vol. 2, p. 108.  This was 12 years after she was a student.

Student Casey Meinert reported that Mr. Zappey put his hands into her vagina and on her butt under her underwear sometime during 2007 or 2008. *Id.*, p. 167. She stated he did this many times, always during reading time in full view of groups of other students. *Id.*, pp. 167–68. She also first reported these details after being contacted by CID about allegations that Mr. Zappey molested another student, and she was then interviewed in 2020 by CID, the FBI, and later U.S. prosecutors. *Id.*, p. 171.

Miss Meinert further testified that she had never forgotten about what had happened to her. *Id.*, p. 170. She also, however, told prior forensic interviewers that she could not remember him going into her vagina such that she was not confident to say it happened. *Id.*, pp. 187–88. Likewise, she testified she had been moved to "realize" her abuse because she was a competitive gymnast growing up, and she had watched a "large court case related to child abuse" with other gymnasts testifying in 2016. *Id.*, p . 170.

Student Angela Julock reported Mr. Zappey touched her breast area, buttocks, and genitals under her pants in front of the class at his desk a few times a week over ten months, likely a hundred times. T. Vol. 3, pp. 11–13, 27. Miss Julock also testified that she had never forgotten, but always remembered what happened to her.

*Id.*, p. 23, 41. Nevertheless, she told earlier forensic interviewers that she *never* remembered such things until she was in high school. *Id.*, p. 23.

Additional facts appear where relevant under argument below.

## SUMMARY OF ARGUMENT

<u>Issue I:</u> The trial court abused its discretion by excluding two defense experts' testimony regarding the reliability of memory. The government's evidence of criminal conduct in this case derives exclusively from the personal testimony of distant alleged memories from teens or young adults alleging instances of child sexual abuse some of which had occurred more than ten years earlier and most of which had never been reported by the victim to anybody in the interim.

Not a single instance of sexual acts or sexual conduct alleged by any of the four witnesses was ever corroborated—not by another witness, not by physical evidence, nor any other evidence—despite claims by all four that the crimes in nearly all instances (hundreds of times for one witness) occurred during class time and in front of other students, sometimes the whole class.

In the sole instance in which one student claimed to have witnessed the defendant putting his hand down the shirt of another student, that other alleged

victim testified that it never happened. Despite the incident allegedly happening in front of other students, not one corroborated it.

As such, there was exactly zero corroboration or verification of any of the claimed instances of sexual crimes. The sole evidence for such crimes rests entirely upon the claimed memories of the victims.

There was, however, evidence of contamination of memories through various interactions with others and various other factors now known by the science of memory to affect or induce false memories. Evidence existed of various such influences, including ambitious and motivated parents bent on vengeance, multiple interviews, appropriations of ideas from psychology texts, admitted influence from high-profile sexual abuse cases in the media directly, as well as evidence that the victims' memories did change over time, especially after interviews with forensic investigators and prosecutors.

This is precisely the type of trial for which expert testimony on the memory is most helpful and necessary. The trial court permitted the government's expert child forensic psychologist who testified that delayed disclosure of years was consistent with child abuse and that abuse victims' memories actually *improve* over time. In both issues, the science of memory is both crucial and helpful to the jury.

The trial court, however, forbid the opportunity for defense experts either to address the various issues of the science of memory at issue, or to refute the government expert's claim to improved memory. The court limited the defense expert testimony to the most basic, prima facie questions, and even cabined the defense's testimony on the improvement of memory over time such that the expert's answer could only favor the government's case. In reaching these decisions, the trial court abused its discretion.

Issue II: The trial court erred in not allowing the defense to present a rebuttal expert to rebut the government expert's testimony regarding memory and late-reported allegations of child sexual abuse. The trial court in this case picked and chose one competing expert over another, allowing the government expert to testify, but not the defense expert. While the government expert testified that memory actually *improves* over time when you are dealing with people who late-report sexual abuse, the court would not allow the defense to put up its expert to rebut this testimony and to explore the science, and describe academic studies, of whether memory improves over time.

It makes no sense to require an expert to testify only to generalities already addressed by an expert for the opposing party, and in a way to avoid truly

9

challenging the opposing side's details, theories, and science in a substantial way. Limiting Zappey's expert testimony to cabined headings addressed by the government's expert does just that: it essentially vitiates the defense and relegates it to repeating the generalities of the government's position, or at best merely contradicting them as generalities.

Because the court limited and excluded the defense experts' testimony, while allowing the government's, the court unfairly left the jury with only one side appearing to have the weight of scientific opinion on its side. This abuse of discretion requires reversal so a jury may make a sufficiently informed and fair determination.

## ARGUMENT

**I.    The trial court abuses its discretion in excluding the expert testimony of the defense regarding memory, in a case where the testimony of witnesses' memories of events allegedly formed 14 years prior, during childhood, constitute the only evidence of criminal wrongdoing.**

This Court reviews a district court's decision to admit or exclude evidence for abuse of discretion. *United States v. Fred Smith*, 122 F.3d 1355, 1357 (11th Cir. 1997). A district court's discretion regarding expert testimony must conform to Federal Rule of Evidence (FRE) 702, which permits expert testimony if 1) the testimony is scientific knowledge, and 2) if it will help the trier of fact to understand

10

the evidence or to determine a fact in issue. *United States v. Smith*, 148 Fed.Appx. 867, 872 (11th Cir. 2005), citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Fred Smith*, 122 F.3d at 1358.

To determine whether expert testimony may "help" the trier of fact, this Court need only determine whether such testimony may be needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves. *Fred Smith*, 122 F.3d at 1358–59, citing *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962).

In this case, there is no dispute that the expert testimony offered by the defense reflects scientific knowledge. During the pre-trial conference, the government initially attempted to characterize Dr. Neuschatz's whole proffered testimony as reliant on "highly speculative inferences," using an isolated and unrepresentative quotation from one of the studies he referenced. (Pretrial Conference, January 9, 2023, Doc. 74, p. 29). Both the government and the trial court quickly agreed, however, that the expert's areas of expertise were admissibly scientific. The court explicitly asked the government's prosecutor, Mr. Palomo, "The government doesn't think it's junk science, does it?" To which Mr. Palomo conceded, "No, Your Honor." (*Id.*, p. 30).

11

The issue presented here, therefore, pertains to the second prong of *Daubert* and FRE 702, whether the scientific knowledge proffered would help the jury.

**a. This Case Is Not Bound By the Prior Precedent of *United States v. Thevis*.**

This Court has previously held a per se rule that a district court does not abuse its discretion when it excludes expert testimony on eyewitness reliability or identification. *United States v. Fred Smith*, 122 F.3d 1355, 1357, 1359 (11th Cir. 1997); *United States v. Thevis*, 665 F.2d 616, 641 (5th Cir. Unit B 1982). *Thevis* announced its rule with language pertaining to "the problems of memory and perception" in general. 665 F.2d at 641; *cf. Fred Smith*, 122 F.3d at 1355; *United States v. Smith*, 148 Fed.Appx. 867, 872 (11th Cir. 2005); *United States v. Owens*, 682 F.3d 1358 (11th Cir. 2012).

In *Fred Smith*, the Court added that its prior panel precedent rule renders *Thevis* binding unless and until the Court en banc, or the Supreme Court, overrules its holding. 122 F.3d at 1359. If this Court were to find that its prior holding in *Thevis* also applies to the exclusion of memory evidence in this case as well, and that its panel precedent rule limits its freedom to reverse the district court, then Appellant presents this issue to preserve it for en banc review. However, *Thevis* does not bind

the Court here as it did in *Fred Smith*, *Smith*, and *Owens*. This Court has held that "[j]udicial decisions cannot make law beyond the facts of the cases in which those decisions are announced." *Anders v. Hometown Mortg. Servs.,* 346 F.3d 1024, 1031 (11th Cir. 2003), citing *Watts v. BellSouth Telcomms., Inc.,* 316 F.3d 1203, 1207 (11th Cir. 2003); *United States v. Smith*, 621 F.Supp.2d 1207, 1214 n. 3 (M.D. Ala. 2009), *aff'd United States v. Smith*, 370 Fed.Appx. 29 (11th Cir. 2010) (not reviewing the expert testimony issue). *Anders*, while acknowledging the prior panel precedent rule noted in *Smith*, clarified that "the holdings of a prior decision can reach only as far as the facts and circumstances presented to the court in the case which produced that decision." 346 F.3d at 1031, citing *United States v. Aguillard,* 217 F.3d 1319, 1321 (11th Cir. 2000) (citations and internal quotation marks omitted).

Unlike the *Thevis* line of cases, this case does not deal with eyewitness identifications, but with reported childhood memories that were not alleged until between 10 and 14 years later. As such, this case presents "facts and circumstances" different from those in the *Thevis* line. Expert evidence of various effects on memory, taint, fabrication, or confabulation due to social or psychological factors are directly relevant and helpful to the jury here in ways that merit independent

13

consideration distinct from the now familiar expert evidence of the reliability of eyewitness identifications. This does not mean, however, that the reasoning of those courts that have admitted evidence of the reliability of memory in eyewitness identifications, or other eyewitness testimony, do not have striking relevance in this case as well, even as many such decisions simultaneously undermine the rationale of *Thevis*. *See United States v. Owens*, 682 F.3d at 1359 (Barkett, J., diss.); *Smith*, 621 F.Supp.2d at 1214.

For example, one of the few federal district courts within this Circuit to admit such testimony helpfully concludes that exclusion of expert testimony on the reliability of eyewitness testimony,

> would be nothing short of untenable in light of the discretion of courts to admit expert testimony that would help factfinders reach more accurate results, recent developments in our understanding of the human mind in the 23 years since *Thevis,* and the unlikely salience of that new but robust scientific knowledge among factfinders. *Smith*, 621 F.Supp.2d at 1214.

This case, in fact, contains "facts and circumstances" that make it particularly fit for consideration of the issue of expert testimony on memory, as the only evidence of alleged criminal conduct hinges on the memories of four witnesses allegedly recollecting events occurring between 10 and 14 years prior, without a single

14

corroboration from anyone, despite claims such crimes occurred in front of multiple other students, whole classes, on multiple occasions. As the district court noted in *Smith* (2009):

> This is precisely the type of case in which eyewitness-identification expert testimony would be of particular use. The strongest evidence that Smith committed the armed bank robbery was two eyewitness identifications by individuals who had had little contact with him. The videotape evidence in this case was, at best, inconclusive. *See United States v. Smithers,* 212 F.3d 306, 317 (6th Cir. 2000) ("[E]xpert testimony should be admitted ... when there is no other inculpatory evidence presented against the Defendant with the exception of a small number of eyewitness identifications."); *United States v. Moore,* 786 F.2d 1308, 1313 (5th Cir. 1986) ("[I]n a case in which the sole testimony is casual eyewitness identification, expert testimony regarding the accuracy of that identification is admissible and properly may be encouraged"). *Smith*, 621 F.Supp.2d at 1214–15.

In this case there are not even two eyewitnesses. Only one witness testified in any given case without further inculpatory support. Like the district court noted in *Smith*, this is precisely the type of case which demands expert help to provide insight into the reliability of the testimony. Across the circuits, several courts have found that where the government's case rests primarily or exclusively on perception or memory testimony, an erroneous exclusion of expert testimony on its reliability is not harmless. *United States v. Nolan*, 956 F.3d 71, 79–83 (2d Cir. 2020) (failure to call an expert on the reliability of eyewitness testimony supports a claim of

15

ineffective assistance of counsel, partially "in light of the Government's heavy reliance on the eyewitness identifications"); *United States v. Brownlee*, 454 F.3d 131, 140–44 (3d Cir. 2006) (exclusion of expert witness on human perception and memory was reversible error where the Defendant's defense and "the primary issue before the jury was the reliability of the Government's four witnesses"); *United States v. Moore,* 786 F.2d 1308, 1313 (5th Cir. 1986) (eyewitness identification expert testimony "is admissible and properly may be encouraged" where the sole testimony that may make the difference between innocence and guilt is eyewitness testimony); *United States v. Downing*, 753 F.2d 1224, 1243 n. 25 (3d Cir. 1985) (exclusion "cannot be said to be harmless" where "the sole evidence against the appellant was eyewitness testimony, . . . appellant's sole defense was mistaken identity, and the exclusion of the expert testimony similarly impaired that defense"); *but see United States v. Davis*, 690 F.3d 226, 257 (4th Cir. 2012) (affirming exclusion where government's case relied on significant other evidence of guilt, including DNA evidence, and not, either exclusively or primarily, on eyewitness testimony); *United States v. Bartlett*, 567 F.3d 901, 906–07 (7th Cir. 2009) (affirming the exclusion of eyewitness expert testimony where multiple witnesses identified the defendant, some of whom knew the defendant well); *United States v.*

16

*Villiard*, 186 F.3d 893, 895 (8th Cir. 1999) (no abuse of discretion in denying expert eyewitness identification testimony where the government's case did not rest exclusively on uncorroborated eyewitness testimony); *United States v. Smith*, 156 F.3d 1046, 1053–54 (10th Cir. 1998) (exclusion not abuse of discretion where five eyewitnesses existed, not just one); *United States v. Smith,* 736 F.2d 1103, 1107 (6th Cir. 1984) (harmless error to exclude expert on eyewitness testimony where government presented three eyewitnesses (not just one) and handprint evidence).

One of the earliest Circuits to adopt expert testimony on the reliability of eyewitness testimony found this very point persuasive: "it would seem anomalous to hold that the probative value of expert opinion offered to show the unreliability of eyewitness testimony so wastes time or confuses the issue that it cannot be considered even when its putative effect is to vitiate the only (eyewitness) evidence offered by the government." *Downing*, 753 F.2d at 1243.

Should this Court determine to distinguish *Thevis*, cases such as this one provide more than appropriate opportunity to hold that this Court may review for abuse of discretion a district court's exclusion of expert testimony on memory, false memory construction, the reliability of memory and eyewitness evidence, and related topics, and to find that such evidence is particularly admissible in cases where

17

the government's case rests primarily or exclusively on eyewitness or memory-based testimony.

When this Court last denied the opportunity to reconsider en banc its rule that appellate courts may not review for abuse of discretion the district courts' exclusions of expert testimony on the reliability of eyewitness testimony, the dissent noted that the holding in *Thevis* was 30 years old. *Owens*, 682 F.3d at 1359. It is now 40 years old, and the fact remains that the Eleventh Circuit stands in conflict with all other circuits, and all 50 states (thus including the three states comprising this Circuit), on the admissibility of such evidence, at least in some circumstances. *Id.* Even at that time, the court had at its disposal the results of some two thousand studies related to the reliability of eyewitness memory (compared to about only four when the Court decided *Thevis*) "making clear that the premise of *Thevis* does not justify a categorical rule of non-review." *Id.*, at 1360, 1360 n. 5; *State v. Henderson*, 208 N.J. 208, 241–242 (2011).

Among the other circuits, the majority approach has not opened the floodgates to expert testimony on reliability of eyewitness testimony or memory, but rather narrows admission to appropriate circumstances. While the Eighth Circuit, for example, which has relatively more developed case law on the issue, generally

18

upholds a trial court's exclusion of expert testimony on memory, it nevertheless affirms admission of testimony on both the general "dangers of implanted memory and suggestive practices" as well as specific application of an expert's general opinions to the facts of the case at hand, so long as the expert does not opine directly on the witness's credibility. *United States v. Rouse*, 111 F.3d 561, 571 (8th Cir. 1997) (harmless error where trial court excluded expert testimony on specific applications to the case because the expert "was intent upon expressing his ultimate opinion that the victims' accusations of sexual abuse were not credible," and had already been allowed to "describe at length the ways in which adults can influence children's memories and the possible impacts of such influences on their credibility.") *See also United States v. Countentos*, 651 F.3d 809, 820–21 (8th Cir. 2011); *United States v. Villiard*, 186 F.3d 893, 895 (8th Cir. 1999) (no abuse of discretion in denying expert eyewitness identification testimony where the government's case did not rest exclusively on uncorroborated eyewitness testimony); *United States v. Whitted*, 11 F.3d 782, 785–87 (8th Cir. 1993) (finding reversible error where government's expert testified to diagnosing alleged victims with "repeated child sexual abuse" because the testimony commented directly on the witness's truthfulness); *Bachman v. Leapley*, 953 F.2d 440, 442 (1992) ("general

19

testimony about a victim's ability to separate truth from fantasy, the expression of an opinion on the similarities between a victim's claim and the evidence, and the comparison of behavioral and testimonial patterns of a particular victim with the behavioral patterns observed in victims in general, were all admissible in certain circumstances"), citing *United States v. Azure,* 801 F.2d 336, 340 (8th Cir. 1986).

Similar rules appear in the First, Second, Fourth, Fifth, Sixth, Seventh, Ninth, and Tenth Circuits. *See, e.g., Thill v. Richardson*, 996 F.3d 469, 473–74 (7th Cir. 2021) (acknowledging permitted expert testimony from child clinical psychologist on false memories planted in children or shaped by external influences such as parents or interviews); *United States v. Nolan*, 956 F.3d 71, 79–83 (2d Cir. 2020) (failure to call an expert on the reliability of eyewitness testimony supports a claim of ineffective assistance of counsel, partially "in light of the Government's heavy reliance on the eyewitness identifications," and jury instructions was not sufficient to cure the problems that would not have been apparent to the jury); *United States v. Hill*, 749 F.3d 1250, 1262–63 (10th Cir. 2014) (In some narrowly circumscribed situations, expert testimony on such things as the nature of delusions analogized to child psychology issues or susceptibility to false confessions "might be properly admitted" even where such "expert testimony touches on the issue of credibility,"

but not testifying "flatly" as to whether a particular witness is truthful or not); *United States v. Davis*, 690 F.3d 226, 257 (4th Cir. 2012); *United States v. Bartlett*, 567 F.3d 901, 906–07 (7th Cir. 2009); *United States v. Granbois*, 119 Fed.Appx. 35, 38 (9th Cir. 2004) (no abuse of discretion in limiting expert testimony regarding specific questions about interviews and memory of alleged child sexual abuse victims because expert's testimony overall adequately conveyed that children can be misled and confused by improper interviewing techniques and that the guidelines for interviewing children should be followed to prevent false memory"); *United States v. Smith*, 156 F.3d 1046, 1053–54 (10th Cir. 1998); *United States v. Harris*, 995 F.2d 532, 535 (4th Cir. 1993) (cross-racial identification, long delay, observation under stress, and psychological phenomena such as the feedback factor and unconscious transference may suffice as narrow circumstances); *United States v. Antone*, 981 F.2d 1059, 1062 (9th Cir. 1992) (expert testimony on "general behavioral characteristics that may be exhibited in children who have been sexually abused" did not improperly bolster testimony of alleged victims of sexual abuse); *United States v. Moore,* 786 F.2d 1308, 1313 (5th Cir. 1986).

A minority of circuits favor general admissibility. *See, e.g.*, *Hurley v. Superintendent Mercer SCI*, 757 Fed.Appx 114, 116, 118 (3d Cir. 2018)

21

(acknowledging expert testimony permitted in trial court on unreliability of repressed memory, without testimony on whether specific witness's memory was repressed); *United States v. Brownlee*, 454 F.3d 131, 140–44 (3d Cir. 2006) (exclusion of expert witness on human perception and memory was reversible error where the Defendant's defense and "the primary issue before the jury was the reliability of the Government's four witnesses"); *United States v. Mathis*, 264 F.3d 321, 339–40 (3d Cir. 2001) (expert testimony on eyewitness identifications, including memory, "apply reliable scientific expertise to juridically pertinent aspects of the human mind and body [that] should generally, absent explicable reasons to the contrary, be welcomed by federal courts); *United States v. Smithers*, 212 F.3d 306, 311–18 (6th Cir. 2000) (district court erred in not admitting eyewitness-identification expert testimony); *United States v. Stevens*, 935 F.2d 1380 (3d Cir. 1991) ("Rule 702 may permit a defendant 'to adduce, from an expert in the field of human perception and memory, testimony concerning the reliability of eyewitness identifications'"), citing *United States v. Downing*, 753 F.2d 1224, 1226 (3d Cir. 1985).

### b. The Trial Court's Exclusion of Defense Experts on Memory

Prior to trial in this case, the government moved to exclude the testimony by the defendant's two experts, Drs. Christopher Tillitski and Jeffrey Neuschatz, whom Appellants intended to testify on the subjects of memory, the formation of memory in children, various ways memory may be affected over time (especially when the events in questions occurred when the subject was 6, 7, or 8 years old), the influence interrogation techniques may have on memory, and "taint factors" dealing with contagion of memories in multi-victim cases, group discussions, family input, or interrogation techniques, etc. Pretrial Conference, January 9, 2023, pp. 21–22, 37–38. The court ended the pretrial conference stating it would allow both defense experts to testify as long as they did not testify directly on the interviews of the children in this case. *Id*., pp. 48–49.

Not long after Dr. Tillitski began to testify beyond the very basics of memory, the government objected. T. Vol. 4, p. 33. During a sidebar, the court discussed several reasons for exclusion, including the government's main objection at the time, that the testimony of Dr. Tillitski was "commenting on the reliability of the testimony in this case and the witnesses," and thus was invading "the province of the jury." *Id*., p. 33, 44. The expert had at no point said anything about the witnesses in the case or their testimony, but only testified to the science of the operation of

23

memory, and had just begun to discuss ways it could be affected or impaired. The court expressed a greater concern that the expert testimony was "not helpful to the jury," and then pronounced it would not allow the testimony, but would allow a proffer to perfect the record. *Id*., p. 44.

When the court subsequently asked defense counsel exactly how he intended to inquire into more specifics, such as whether the alleged victims had been asked leading questions in interviews, counsel replied that the defense had transcripts to prove it. The court then replied, "You are going to confuse the jury," creating an impossible catch-22 to negotiate. Counsel responded that "half the time the government is arguing this has nothing to do with this case, and the other time they're saying this has too much to do with the case, now you're commenting on the witnesses." *Id*., p. 51.

After a further hearing outside the presence of the jury, the court drastically limited the expert's testimony to only a few basic questions (even directing the formulation of one question that would favor the government's expert testimony already on the record), and nothing more about the specifics of memory, taint of memory, interviews, or similar subjects, essentially eviscerating the defense testimony. *Id*., pp. 33–85. For example, the court ruled that Dr. Tillitski could only

24

state that while memory does not generally improve over time, "a memory can improve over time; a person can find that locked box in his brain that he previously couldn't find. Something, a cue or something helps him find it." *Id*., p. 75–76. The court then forbid Dr. Tillitski from testifying from the vast storehouse of scientific knowledge he possesses that memories could be corrupted over time, false memories are often created, and how, or that cues could create inaccurate memories, or anything relating to false memories. He was only permitted to testify as to *how* cues can trigger *accurate* (not inaccurate) memories, which supported the government's case. *Id*., p. 75–76, 89. In short, the court effectively transformed a defense expert into a government expert by cabining and tailoring his testimony. The court usurped the role of expert itself, picked and chose which select bits of science were scientific, and demanded the actual experts to parrot the bench. The trial court also provided no explanation as to why its chosen question about triggering accurate "locked" memories may help the jury understand memory while simultaneously finding the remaining vast body of memory science unhelpful and a waste of time.

Similarly, after a hearing to proffer the testimony of Dr. Neuschatz, the second expert on memory, eyewitness memory, and false memory construction, the judge ruled abruptly, "I still find that the probative value of this testimony is substantially

25

outweighed by its prejudicial effect, as I have already discussed." T. Vol. 5, pp. 4–22.

The district court in this case did not properly consider that the proffered testimony of Dr. Neuschatz would help the jury, at the very least, by clarifying facts or issues which are not of common understanding to a jury. *Fred Smith*, 122 F.3d at 1358–59; *Salem*, 370 U.S. at 35. The Advisory Committee Notes to FRE 702 state,

> FRC 702 requires that the expert's knowledge "help" the trier of fact to understand the evidence or to determine a fact in issue. Unfortunately, some courts have required the expert's testimony to "appreciably help" the trier of fact. Applying a higher standard than helpfulness to otherwise reliable expert testimony is unnecessarily strict.

There is no question, however, that the proffered testimony here would help the jury determine facts at issue in the case, and maybe even meet the hypothetical "appreciably help" standard. This case hinged almost exclusively on the testimony of memories from four alleged victims who did not describe themselves as victims until 10 to 14 years after the alleged incidents. The government's entire case hinged on these witnesses' memories, so much so that during the sidebar, the court expressed fear the evidentiary "sideshow" would take over the case. T. Vol 4, p. 42–43. When defense counsel assert, "It's the whole case," the court conceded, "It's his whole defense." *Id*. The defense theory asserted that the memories of these four

26

witnesses were flawed, and then sought to admit expert testimony, backed by countless scientific studies, as to, among many things, how and why memory becomes flawed and why people commonly do not understand it properly, including juries.

The record and potential evidence in the case was filled with various relevant factors pertaining to these scientific issues regarding memory. Each of the four alleged victims testified on direct as to their memories, sometimes as "vividly," "clearly," "distinct," or "very clear in my mind," from events that allegedly occurred up to 14 years earlier when the witnesses were ages 6, 7, or 8. Their distant memories were not recalled until their later teens after triggers, social discussions, news reports about sexual abuse victims, and input from parental and governmental authorities and interviews. (T. Vol. 1, pp. 45, 47, 48, 51, 53, 54, 58, 99; Vol. 2, pp. 170, 187–88; Vol. 3, pp. 39, 41, 44, 45, 105–106, 107–108, 122, 123, 124, 126, 127, 129, 140–141, 150).

Further, in the final, polished, for-trial version of the witnesses' testimonies, the government made sure to get on record that the witnesses had indeed *always* remembered the events, not forgotten and only lately "remembered" due to triggers. For example,

27

Redirect examination of Anna Dececco:

Q. So was this ever a memory that just wasn't there and suddenly resurfaced in 2020?

A. No.

T. Vol. 1, p. 99.

Direct examination of Casey Meinert:

Q. Did you tell anyone at that time in 2016 when you realized what had happened was sexual abuse?

A. No, ma'am.

Q. Had you forgotten about what happened to you?

A. No, ma'am.

T. Vol. 2, p. 170.

Redirect examination of Angela Julock:

Q. Angela, did you ever forget what happened to you?

A. No.

Q. Can you explain that for the jury?

28

A. I had always remembered what happened, but I didn't know that what had happened was something that shouldn't be happening to a child.

T. Vol. 3, p. 41.

Maeve Hennesy:

But as I have explained today, it wasn't a re-memory, it wasn't a remembering, . . . It's not like a clicking of oh, I suddenly remember, like I'm awoken.

*Id*., p. 140–41.

That the government found it crucial to include testimony on this point shows the centrality of the nature of memory *and how it works over time* to the case.

Yet in each case, evidence also existed for factors that, under expert illumination, would have rendered the uniform chorus of "always remembered" suspect with scientific precision. Witnesses revealed influences that would have been the crucial subjects of expert testimony, such as the influences one authority figure (a mother who was also a lawyer) encouraging the witness to present herself as "confident in every memory you have" in order to "finally avenge" the "little girl." T. Vol. 1, p. 68.

29

Evidence revealed that a witness' mother and father were involved in networking behind the scenes, contacting other witnesses, motivating them with messages promising to leverage military connections among Marine lawyers and attorneys general in the U.S., and even contacting the President of the United States if necessary, demanding prosecution and vengeance against Zappey. *Id*., pp. 67–68.

Another witness, who had subsequently studied psychology, made multiple references in testimony to her own theories of memory:

"I don't think that's really how my memory works." . . .

"I can't say most of the time, because those memories don't work like that in my head." . . .

"I don't think that's how my memories work." T. Vol. 3, pp. 105–06, 122, 124.

The same witness specifically claimed that changes in her story from previous interviews up until trial derived in part due to appropriation of outside psychology resources and an attempt to increase the sophistication of her account:

"I used definitive language back then, I wouldn't now. . . . I have more sophisticated language to describe what actually was going on in my head." . . .

I was taking AP Psychology at the time, so it sounds like I was taking words that I had learned and not actually . . . like, I wanted to sound more sophisticated than I probably was back then. *Id*., pp. 140–41, 150.

At least two of the alleged victims previously stated in official interviews that their memory had "clicked" or was "unlocked" at later dates. T. Vol. 1, pp. 69–70; Vol. 3, pp. 140–41. Another stated she "realized" abuse when she was 16, eight years after the alleged abuse, only after watching other gymnasts testify in "a large court case related to child abuse" (The Larry Nassar trial, which was a nationally-publicized, highly evocative landmark of the #MeToo movement[1]). T. Vol. 2, p. 170. Yet another testified that she attended a Roman Catholic church, and when she was in ninth grade, several years after the alleged incident, watching a video on the scandals of pedophiles in the priesthood "triggered" her brain. T. Vol. 1, p. 55. In each case, outside influences, including powerful media and social phenomena coincided with their memories.

---

[1] *See* Carla Correa, "The #MeToo Moment: For U.S. Gymnasts, Why Did Justice Take So Long?" *The New York Times*, January 25, 2018; https://www.nytimes.com/2018/01/25/us/the-metoo-moment-for-us-gymnasts-olympics-nassar-justice.html (accessed August 22, 2023).

While facts at issue such as discrepancies and outside influences like these in themselves constitute memory evidence that traditionally would make prima facie colorable material for cross-examination or closing argument, the science on memory and false memory construction is crucially more probative. As some courts have determined, a jury should not be left only with the limited probative value of cross-examination in a case like this, but rather it would crucially help the jury to know the scientific inputs that often determine such changes, or how and why such outside influences and factors crucially affect memory. *Young v. Conway*, 698 F.3d 69, 77–89 (2d Cir. 2012) (jurors tend to overestimate the likely accuracy of eyewitness evidence, frequently rely on the testimony of mistaken eyewitnesses, and may also erroneously rely on certainty as an indicator of accuracy, making cross-examination "less likely to be effective in discrediting an eyewitness") (some internal quotation marks omitted).

Mr. Zappey's first expert, Dr. Tillitski, is a specialist and expert in child and teen forensic psychology. Dr. Tillitski would have testified about various factors helpful to the jury in facts at issue in this case, particularly regarding memory, including: the importance of the source of false memories, whether an authority figure or not, confidence versus reliability of memory, interview protocols,

32

aftereffects of the dos and don'ts of interviews, the encoding, retention, access and recall stages of memory and how memory may be affected at each stage, the relevance of age and development progress on memory, the greater likelihood of tainted memories under different circumstances, the improvement or degradation of memory over time, ways to verify memory in professional practice, the considerations of independent verification, immediate disclosure, or physical proof, intervening protocols, types of triggers or cues that may skew or create wrong memory, DRM studies, gap filling, and memory conflation. T. Vol. 4, pp. 33–85.

Mr. Zappey's second expert, Dr. Neuschatz, is a psychologist who has dedicated 20 years of practice, research, and peer-reviewed publication on memory and memory issues as they relate to law. He was to be tendered as an expert on memory, eyewitness memory, and false memory construction. T. Vol. 5, p. 5. Dr. Neuschatz's testimony would prima facie help the jury because, in his words, "memory doesn't work like most people think it does." *Id*., p. 9. Drawing from the scientific literature, over 30 of his own articles, including peer-reviewed articles, and his own testimony in over 100 court cases, Dr. Neuschatz would have testified to: the DRM paradigm regarding memory, malleability of memory, why memory changes, confidence versus accuracy factors, organization and gap-filling, research

33

examples, statistics and reasons for false childhood memories, experiments demonstrating known false memories triggering changes in behavior, factors that have been shown to increase the likelihood of false memories (such as youth, fantasy-prone personality, leading or suggestive questioning, certain therapeutic techniques, imagination inflation, cross-talk contagion or coordination of false memories), changes in discrepancy detection over time, retention intervals, memory incorporation, post-event recollection, false memory creation due to interviewer suggestion or input, the indistinguishability of physiological experience with true versus false memories, the heightened psychological and personal motivating factors for false memories in the real world versus the lab, and methods of verification. His testimony would have included examples from research experiments demonstrating that children and young adults have been made to believe that they had experienced trauma, such as being attacked by a vicious animal or having had an altercation with police and had been arrested, even though no such things had ever happened. *Id.*, p. 13.

Each of these issues proffered through Drs. Tillitski and Neuschatz were highly probative of the facts centrally at issue in the case. Each of these areas of expert testimony would help the jury because the science of memory is not

commonly known and is often counterintuitive. Even where, in some cases, certain phenomena may be recognized in a prima facie way—such as "memory fades over time"—the ways in which it happens, many of which are relevant to the facts of the inputs and influences in this case, are not commonly known, nor is it commonly realized just how intensely the phenomena may affect memory, according to the scientific literature. These features of the expert testimony in this case far exceed the requirement that, to be helpful, expert testimony must at least clarify facts and issues of common understanding. *Fred Smith*, 122 F.3d at 1358–59; *Salem*, 370 U.S. at 35. Here the jury could not truly have understood the potential for false memory creation and could in fact have been misled by the common understanding *without* the expert testimony. Thus, excluding the expert testimony in this case was an abuse of discretion. And Mr. Zappey is now languishing in prison for the remainder of his life.

### c. FRE 702 And FRE 403 As Referenced In This Case

While the bulk of the discussions before and during trial regarding the admissibility of Mr. Zappey's experts pertained to FRE 702, the court in its final pronouncement excluding Dr. Neuschatz's testimony included language similar to

that of FRE 403: "I still find that the probative value of this testimony is substantially outweighed by its prejudicial effect, as I have already discussed." T. Vol. 5, p. 22.

FRE 403 states,

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

The trial court's final ruling cited "prejudicial effect." T. Vol. 5, p. 22. The district court made no finding of "unfair prejudice" regarding the defense experts' testimony. Exclusion, therefore, cannot be based on unfair prejudice.

The trial court also refer to "the prejudicial effect of waste of time, the confusion, and the unnecessariness of it." T. Vol. 4, p. 8. Further, during pretrial conference, the court merged the same language with terms from FRE 702 and *Daubert*:

> But I'm wondering how necessary his testimony is. I'm wondering how helpful his testimony is, and I'm wondering if it isn't confusing, wasting time, and, again, a confusion of the issues.

36

This is what Daubert is telling me to be able to look out for. You correctly said this is a Daubert issue. Pretrial Conference, Jan. 9, 2023, p. 29.

This Court has previously read "between the lines" in similar cases to determine the underlying nature of the trial court's ruling on expert evidence. In *Fred Smith*, for example, the court discerned based on trial transcripts that the exclusion pertained to helpfulness to the jury and "common knowledge and experience of the average lay person" rather than invading the province of the jury under FRE 704(a). 122 F.3d at 1358 n. 1. The trial court's previous discussion suggests that it conflated ideas from both FRE 702 and 403, yet considered its concerns about the "prejudicial effect" of wasting time to be related to the "helpful" prong of *Daubert*: "this is a Daubert issue." FRE 702 should control here.

The rule for not being unhelpful to the jury (FRE 702) and not wasting the jury's (or the court's) time (FRE 403) overlap in this case, because the waste of time was premised upon the idea of presenting unnecessary testimony to the jury and thus wasting its time by definition. The argument on FRE 702 herein, therefore, addresses a ruling on both grounds.

To the extent that the trial court may have premised its ruling on "confusing the issues" under FRE 403, the approach herein is similar. Confusion of the issues

37

could arise in this context conceivably where the trial court determined that expert testimony on the reliability of eyewitness testimony has so far been developed primarily only for contexts of eyewitness identifications, and that the science of memory in that context does not apply to the issues of memory in child sexual abuse setting in which victims recall past memories. Presenting memory science on eyewitness identification outside of that context will therefore lead to confusing the jury.

Part 1.b. above demonstrates that even this conceivable position would constitute an abuse of discretion because the experts tendered by the defense bear credentials of experience in sexual abuse cases as well as others, and both offered testimony on expertise and science on various aspects of memory that apply to memory in general, not just eyewitness identification settings.

**II.    The trial court abuses its discretion in excluding the expert testimony of the defense regarding memory to counter the government's expert testimony on late reporting of sexual abuse, trauma, and memory which the court permitted the government to present.**

The purpose of FRE 702 is to help the jury determine facts at issue in the case by applying scientific knowledge.

Where two experts have competing interpretations of scientific topics on memory in a case dealing with sexual abuse, the court should either admit or deny both, but not pick and choose. *See Clark v. Edison*, 881 F. Supp.2d 192, 210–212 (D. Mass. 2012). In *Clark*, the district court stated that if the Court were to pick and choose which expert on repressed and recovered memory (for or against) would testify in a case of alleged sexual abuse, it would defeat the purpose of FRE 702, to assist the jury in applying scientific knowledge. *Id.*, at 212.

> [A]dmission of either expert's testimony without the other would present a distorted view of the scientific debate. Put another way, it would be meaningless to admit Dr. Pope's testimony, which is in the form of a rebuttal, without that of Dr. Hopper. Conversely, admitting Dr. Hopper's testimony without that of Dr. Pope would disguise the fact that reasonable experts appear to disagree on the topic. *Id*.

The court concluded that the two positions, even if one or the other is controversial, represent two sides of a coin, and it is not the court's role to determine which is applicable. It is the jury's role, and both should be permitted to testify. *Id*.

This rule may have added emphasis in some cases determining criminal responsibility. This Circuit has ruled that a rebuttal expert is crucial to fully informing a jury where critical determinations of an alleged criminal's mental state are at issue. *United States v. Edwards*, 819 F.2d 262, 264 (11th Cir. 1987)

39

(Permitting testimony from a rebuttal expert because "In resolving the complex issue of criminal responsibility, it is of critical importance that the defendant's entire relevant symptomatology be brought before the jury and explained. It has long been the position of our court that this is the only way a jury may become sufficiently informed so as to make a determination of a defendant's legal sanity") (citations omitted). While *Edwards* pertained specifically to a determination of a defendant's legal sanity, there is no reason the same principles of fully informing a jury by hearing all relevant expert opinions should not apply in all cases determining "criminal responsibility," or witness reliability for that matter.

The trial court in this case picked and chose one competing expert over another. The court allowed the government to present expert testimony through forensic pediatrician Dr. Sharon Cooper. T. Vol. 2, p. 5. Dr. Cooper testified on the subjects of delayed disclosure (of sexual abuse), predatory grooming related to child sexual abuse and the difficulty children have in distinguishing between appropriate and inappropriate touching.

During her testimony, Dr. Cooper opined that delayed disclosure is the rule, most children do not disclose sexual abuse during childhood, but much later when they "recognize something has happened to them that is inappropriate . . . or think

40

back about this or have intrusive thoughts about what happened to them." *Id*., pp. 16–17. She added that "the most comprehensive research" determined that the average age of disclosure was 52 years of age and that 80 percent of "survivors" do not disclose during childhood at all. *Id.*, pp. 18–19.

Dr. Cooper also testified as to the fact that forensic interviewers are trained to ask specific questions and use suggestive imagery to elicit particular types of answers based on a child's perceptions about touch, their bodies, and their language. *Id*., p. 22. She testified that children who have been groomed are more likely to disclose later, as well as to the mental states of groomed children, what they will be thinking or unsure of. *Id*., pp. 24, 25. She also testified that memory and sensory issues are important issues in forensic interviewing particularly of children, and notably that, with alleged survivors of child sexual abuse, memory does not fade over time because various triggers merely help them "recover their information," but from things such as the Larry Nassar trial, we learned that "these victims always had those memories." *Id*., pp. 44–47, 51, 55.

Mr. Zappey did not object to this testimony that pertained to various aspects of memory because it could be challenged and rebutted by the defense experts, and the court in pretrial conference had stated that it would allow both defense experts

41

as long as they did not comment on the specific interviews of the witnesses. Pretrial Conference, January 9, 2023, pp. 48–49. The court, however, deprived Mr. Zappey of his expert defense on these issues. It was as if a baseball game were played and one team stayed at bat for nine innings, but the opposing team was never permitted to take its turn at bat.

During a later hearing debating the exclusion of most of Dr. Tillistki's testimony, the court granted the government's premise that the defense experts could only testify broadly on the general topics touched upon by the government's expert. The exchange was as follows:

> THE COURT: Well, that's how I feel. I think that the government, you know, refuting the specific testimony of Dr. Cooper, obviously, is fair game, to be sure. But she talked about delayed disclosure and grooming and the . . . difficulties kids have in distinguishing between appropriate and inappropriate conduct. Those three areas are vulnerable to attack.
>
> But the larger -- memory at large picture is not. I'm just not going to allow it. T. Vol. 4, p. 57.

Defense counsel replied "I don't think it's appropriate to say we can only focus on what they focused on." *Id.*

Several problems arise from the court's imposed limits here. The nature and reliability of memory is inherent in the topic of delayed disclosure, as well as in other

42

topics she addressed. Dr. Cooper addressed things in detail beyond just the generalities of what the court prescribed, some of which directly addressed or implied memory. Likewise, Dr. Cooper made controversial claims about memory in her capacity as an expert, such as that memory improves over time for sexual abuse claimants.

While the government expert testified that memory actually *improves* over time when dealing with people who late-report sexual abuse, the court would not allow the defense to put up its expert to rebut this testimony and to challenge the claim that memory improves over time. *Id*., pp. 64–65.

It makes no sense to require an expert to testify only to generalities already addressed by an expert for the opposing party, and in such a way as to avoid truly challenging the opposing side's details, theories, and science in a substantial way. Limiting Zappey's expert testimony to cabined headings addressed by the government's expert does just that: it essentially vitiates the defense and relegates it to repeating the generalities of the government's position, or at best merely contradicting them as generalities.

Because the court limited and excluded the defense experts' testimony, while allowing the government's expert to offer incriminating testimony, the court left the

43

jury with only a one-sided coin. This abuse of discretion requires reversal so a jury may make a sufficiently informed, and fair, determination.

## CONCLUSION

During the pretrial hearing concerning the admissibility of the expert testimony on memory, the trial judge offered the following observation:

> THE COURT: I get the thing about memory. We did a neuroscience thing, a couple things at Duke that we went to, and I have an open mind about the fact that, you know, most people think of memory as like their brain is a librarian who goes and pulls out the book, opens it up, and there is what we have. . . . And you are looking at a picture of a red apple. . . . And next to it is a green pear. . . .
>
> Well, what I have learned in my own life after watching this and being taught this, being exposed to this theory, is there are times when you would swear . . . . that it was a red apple and a green pear, and it wasn't. (Pretrial Conference, Jan. 9, 2023, p. 23)

By this elucidation, the trial judge himself provided the exact reasoning as to why even the most basic applications of human memory and testimony involve counterintuitive science that a normal jury would not know, and in fact that that even judges require training, experience, and exposure to expert theories to learn. The problem in this case, however, is that the judge immediately followed his essential agreement with the defense by arbitrarily negating it:

44

The problem is, though, do you need an expert to help the jury with that? Everybody knows that. (*Id.*)

In line with the judge's confessed experience and immediately preceding reasoning, however, Appellant urges this Court to find that everybody does *not* know that. Expert testimony on such information would, therefore, help the jury.

That a judge can make an innocent mistake on this issue, not even realizing he's making a mistake on it, highlights the *necessity* of expert testimony on these issues for all people, especially jurors who must make the most crucial decision in cases of guilt or innocence. If a judge can make that mistake, anyone can, and we all need to be protected from it.

For the foregoing reasons, we urge this Court to reverse the conviction.

This, the 25th day of August, 2023.

RESPECTFULLY SUBMITTED,

GARLAND, SAMUEL & LOEB, P.C.

/s/ *Donald F. Samuel*
DONALD F. SAMUEL, ESQ.
Georgia Bar Number 624475

3151 Maple Drive
Atlanta, GA 30305
Tel.: (404) 262-2225
Fax: (404) 365-5041

45

Email: dfs@gsllaw.com

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff -Appellee, | ) | |
| | ) | |
| v. | ) | Appeal No.: 23-11607 |
| | ) | |
| STEFAN EBERHARD ZAPPEY, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this **BRIEF OF APPELLANT** is in 14-point Times New

Roman type and contains 9,666 words.

This, the 25th day of August, 2023.

RESPECTFULLY SUBMITTED,

GARLAND, SAMUEL & LOEB, P.C.

/s/ *Donald F. Samuel*
DONALD F. SAMUEL, ESQ.
Georgia Bar Number 624475

3151 Maple Drive
Atlanta, GA 30305
Tel.: (404) 262-2225
Fax: (404) 365-5041
Email: dfs@gsllaw.com

## **CERTIFICATE OF SERVICE**

I certify that on this day I electronically filed **BRIEF OF APPELLANT** with

the Clerk of Court using the CM/ECF system which will automatically send email

notifications of such filing to all counsel of record in this matter:

> Gabriel Adam Mendel, A.U.S.A.
> United States Attorney's Office
> 75 Ted Turner Drive, S.W.
> Suite 600
> Atlanta, Georgia 3030

This, the 25th day of August, 2023.

RESPECTFULLY SUBMITTED,

GARLAND, SAMUEL & LOEB, P.C.

/s/ *Donald F. Samuel*
DONALD F. SAMUEL, ESQ.
Georgia Bar Number 624475

3151 Maple Drive
Atlanta, GA 30305
Tel.: (404) 262-2225
Fax: (404) 365-5041
Email: dfs@gsllaw.com